## State Bank *versus* McCoy.

1. The total drunkenness of the maker when he executes a note, if known to the payee, makes it void as to him.

2. The contract of an insane man is not under *all circumstances* an absolute nullity.

3. A drunken man is responsible to an innocent party for acts he commits in that condition ; although an insane man would not be.

4. Drunkenness is a temporary disability voluntarily produced : insanity is permanent and Providential.

5. On grounds of public policy and the necessities of commerce, the defence of drunkenness in the maker cannot be set up against the innocent holder of a negotiable note.

6. McCoy whilst drunk made a negotiable note ; it was bought by a bank with a large amount of other notes at half its value : the bank was informed that it had been given for a patent hay-fork, and required a guaranty for its payment. *Held,* that the bank was not guilty of gross negligence in taking the note without inquiry of the maker.

7. Even gross negligence would not have defeated the bank's title, without proof the bank took it *malâ fide,* or with notice of the fraud.

8. Whether the bank could lawfully purchase notes at so great a rate of discount, not decided.

May 19th 1871.    Before AGNEW, SHARSWOOD and WILLIAMS, JJ.

Error to the Court of Common Pleas of *Juniata county :* No. 62, to May Term 1871.

This was an action of assumpsit, brought to September Term 1870, by the State Bank, endorsee, against Neal McCoy, on a note for $225, dated March 11th 1870, and payable July 1st 1870, to J. J. Wilhelm & Co., or bearer.

The defence was, that the defendant had been fraudulently induced to execute the note when he was so much intoxicated as to be incapable of making a contract.

The case was tried before Graham, P. J.

For the plaintiff Henry A. Sturgeon testified :—

" I am cashier of State Bank at Harrisburg.   On 20th June 1870, J. J. Wilhelm, of firm of Wilhelm & Co., called on me to sell a number of that same kind of notes ; I consulted two or three of our directors, and we agreed to purchase the lot at the price he asked for them—Mr. Wilhelm being well known to Mr. Mumma, one of our directors.   Mr. Wilhelm resides in Lebanon, Pennsylvania.   We paid for them on the 20th June ; I sent the note to Juniata Valley Bank, 21st June, for collection.   Protested on the 2d July.   We paid him 50 cents on the dollar.   We bought same kind of notes at same time, but on different parties.   We had a guaranty from Mr. Moyer for payment of all these notes ; I would not have taken them without a guaranty ; Mr. Wilhelm said these notes were given for patent hay-forks."

The defendant testified :—

[State Bank *v.* McCoy.]

"I have no recollection of ever giving this note. I think I signed it; it looks like my handwriting; I am sure I did not know a hate about it when I did sign it; I would have had some wit if I had known what I was about, to sign that note. The first I knew of it was when it was left in bank for collection. The day before I came to Patterson with a load of ties and forgot to go home. The next morning I got two or three drinks and a bottle and went home—I can mind to Johnstown. I took a drink at top of every hill, from Johnstown I can't remember anything; I have no recollection of any one treating me, or taking me to get a drink. I don't know Wilhelm & Co., or any of their agents; I have no recollection of meeting any one wanting to sell a patent hay-fork; no one ever sent me a scrape of a pen, or fork or anything; I never saw any of those forks to best of my knowledge. This is my signature to this paper. I never got anything for this note."

William Young testified:—

"I know Mr. McCoy well; a man brought him into my hotel in Mifflin. They came to bar, each took a glass of ale; McCoy had a good load on; they sat half an hour; the man was trying to sell him a right of hay-fork; McCoy came up to bar, said, 'give more ale.' I refused; he started out, said 'he would go some place else.' The man went with him; it was beginning of last March. He was drunk, not able to do any kind of business."

The plaintiff submitted points, which with their answers are as follows, viz. :—

1. The fraud practised by Wilhelm & Co., or their agents, on McCoy in obtaining the note in suit, must be brought home to the plaintiff; the present holder or bearer, by positive and actual notice as to the particular note in suit, and such notice must be given by the maker (McCoy), or some one authorized by him to give it; and such notice must be *actual*, and not by implication. That in this case there is no evidence of any actual notice.

Answer: "I cannot answer this point as requested, except to say there is no evidence of actual notice."

2. The discounting, or rather the purchasing of this note at a heavy discount, where there is an absolute sale (as in this case), is not evidence of knowledge of fraud, and was a lawful purchase, for there is no money loaned to be repaid, and therefore is no violation of the laws against usury.

Answer: "The discounting or purchasing this note at a heavy discount, would not of itself be evidence of knowledge of fraud; but it is evidence, which in connection with the other circumstances attending the purchase of the note, the jury may consider in determining whether the plaintiff was guilty of gross negligence in not making inquiry before it made the purchase."

3. The plaintiff in this case has shown by uncontradicted evidence that it is a bonâ fide purchaser for value, and before a recovery can be defeated, the defendant must prove that the plaintiff had notice of the fraudulent manner in which the note had been obtained, and of this there is no evidence.

Answer: "Before the defendant can defeat a recovery, he must show that the plaintiff had notice of the fraudulent manner in which the note had been obtained. But actual notice is not required. The plaintiff may be affected by constructive notice; and if you believe from the evidence in reference to the purchase of this note, as stated by Mr. Sturgeon, the cashier, that the plaintiff was grossly negligent in not making inquiry how the note was obtained, this will affect plaintiff with notice of the fraud, and permit you to inquire whether the note was actually procured by fraud from the defendant."

5. The fact of plaintiff having taken a guaranty to the extent of 50 per cent. on this note has no legal significance, is without any material bearing in this case, and is no impediment in the way of plaintiff's recovery.

Answer: "The guaranty of 50 per cent. taken by the plaintiff from the holder of the note to recover the amount paid for it by the bank, would not, standing alone and unsupported by other evidence, be sufficient to affect the bank with knowledge or notice of the fraud. But I cannot say to you 'that it has no legal significance, is without any material bearing in this case, and is no impediment in the way of plaintiff's recovery.' You may consider the fact that a guaranty was given to the bank to cover the whole amount it paid for the note, in connection with the other evidence in the case, in determining the question of gross negligence—combined circumstances may be sufficient to put the plaintiff upon inquiry, though no one was decisive. And the guaranty, in connection with the evidence of Mr. Sturgeon, may be some evidence tending to show that the note was purchased more upon the faith of the guaranty than the credit of the defendant."

6. On the whole facts of the case the plaintiff is entitled to recover.

Answer: "I will not answer this point in the affirmative. The question presented by this point, whether upon all the facts of this case the plaintiff is not entitled to recover, is a question of law for the court, and I will reserve the point."

The verdict was for the defendant, and the court entered judgment on the verdict on the reserved point.

The plaintiff took a writ of error, and assigned for error the answers to the points.

*B. F. Junkin* (with whom was *J. Lyons*), for plaintiff in error, cited Phelan *v.* Moss, 17 P. F. Smith 59.

[State Bank *v.* McCoy.]

·· *J. Alexander*, for the defendant in error.—Drunkenness is a defence to a contract: Story on Contracts, §§ 27, 28, and cases cited; Pitt *v.* Smith, 3 Campb. 33; Pothier on Obligations, P. 1, art. 4, § 49. Notice may be inferred from circumstances sufficiently strong to cast a shade on the transaction, and put the holder on inquiry: Story on Notes, § 198; Commonwealth *v.* Baldwin, 12 Pick. 151; Id. 545.

The opinion of the court was delivered, July 3d 1872, by'

WILLIAMS, J.—This was an action brought by the State Bank, as endorsee, against the defendant as maker of the promissory note sued on, and the defence was that it had been fraudulently obtained from the defendant when he was drunk, and that the bank took it under such circumstances of suspicion that it was not a bonâ fide holder for value, without notice of the fraud. Under the charge of the court, the jury found that the defendant received no consideration for the note; that he was so intoxicated at the time he signed it, as to be wholly unconscious of what he was doing; and that the bank was guilty of gross negligence in taking it. Waiving for the present the question as to the sufficiency of the evidence to justify the jury in finding that the bank was guilty of gross negligence in taking the note; the first matter to be considered is, whether the intoxication of the defendant, at the time he signed it, is a valid defence to the action, if the bank is a bonâ fide holder of the note for value, without notice of the fraudulent circumstances under which it was obtained. Undoubtedly, the total drunkenness of the maker when he executed the note, if known to the payee, rendered it void as to the latter: Gore *v.* Gibson, 13 M. & W. 623. The old rule that a man should be held liable upon a contract made by him when in a state of intoxication, on the ground that he should not be allowed to stultify himself, has been long since exploded, and it is now settled according to the dictate of good sense and common justice, that a contract made by a person so destitute of reason as not to know the consequences of his contract, though his incompetency be produced by intoxication, is void as between the parties: 2 Kent's Com. 452. As was said by Parke, B., in Gore *v.* Gibson: "Where the party, when he enters into the contract, is in such a state of drunkenness as not to know what he is doing, and particularly when it appears that this was known to the other party, the contract is void, and he cannot be compelled to perform it." But if the drunkenness of the maker, when known to the payee and taken advantage of by him; or when so complete as to suspend the use of the reason and understanding, renders the note void in the hands of the payee, the question recurs whether it avoids it in the hands of an endorsee for value without notice of the maker's condition when he gave the note and of the frau-

dulent circumstances under which it was obtained? There is no case which so decides. But it is contended that drunkenness is a species of insanity, and, therefore, a contract made by one when in such a state of drunkenness as not to know what he was doing, should, like the contract of an insane person, be regarded as absolutely void. But the contract of an insane man is not, under all circumstances, an absolute nullity. As was said in La Rue *v.* Gilkyson, 4 Barr 375, an insane man like an infant is liable on his executed contract for necessaries; and it was more than intimated in Beals *v.* See, 10 Barr 56, that he would be liable for merchandise innocently furnished to his order by a person unapprised of his infirmity. But if, as ruled by Lord Tenterden, C. J., at Nisi Prius, in Sentance *v.* Pool, 3 C. & P. 1 (14 Eng. Com. Law 419), the note of an insane person, or of one perfectly imbecile, which he has been induced to sign by fraud and imposition, is void in the hands of an innocent endorsee; it does not follow that a note given by a person in a state of intoxication is void in the hands of a holder for value, without notice of the maker's condition when it was given. There is this difference between the cases. Insanity or total imbecility is a permanent state or condition of the mind, disabling one from taking care of himself. Drunkenness is a temporary disability, voluntarily produced. Insanity is a misfortune—drunkenness is a vice. No man voluntarily does an act necessarily producing madness in order that he may become insane. But men drink in order that they may get drunk. And when they thus temporarily deprive themselves of the use of their reason, and voluntarily expose themselves to fraud and imposition, the law may wisely refuse to treat them with the same tenderness that it does those unfortunate beings who are deprived of their understanding, by some Providential dispensation; and it may properly hold them to a different measure of responsibility for the consequences of their acts. If a man voluntarily deprives himself of the use of his reason by strong drink, why should he not be responsible to an innocent party for the acts which he performs when in that condition? It seems to me that he ought, on the principle that where a loss must be borne by one of two innocent persons, it shall be borne by him who occasioned it. As between the contracting parties, where one of them is so drunk as not to know what he is doing, the contract is doubtless void, especially if the other is apprised of his condition, and, if not wilfully or culpably blind, he must know it. As was said by Parke, B., in the case already quoted: "A person who takes an obligation from another under such circumstances *is guilty* of actual fraud." But if there is nothing to give notice of the intoxication, or to put one upon inquiry, as where a contract is made by letter or message sent by post or telegraph, and is executed in good faith by the party receiving the order, if the other

party should refuse to perform the contract on the ground that he was totally drunk when he sent the order or entered into the contract, it is clear that, on the principle already stated, the defence ought not to avail. Why then should the maker of a note be allowed to set up against an innocent holder the defence of drunkenness? But there is another and controlling reason for holding the maker liable to the endorsee in such case, founded on principles of public policy and the necessities of commerce. The exigencies of trade require that there should be no unnecessary impediments to the ready circulation and currency of negotiable paper, but that it should be left free to pass from hand to hand like bank-notes, and perform the functions of money, untrammelled by any equities or defences between the original parties. If then, it should be held that the drunkenness of the maker avoids his note in the hands of the endorsee, it is obvious that such a rule would greatly clog and embarrass the circulation of commercial paper, for no man could safely take it without ascertaining the condition of the maker or drawer when it was given, although there might be nothing suspicious in its appearance or unusual in the character of the signature. It is evident that it would be a less evil to exclude the defence of drunkenness, though it might occasionally work individual hardship, than to clog the circulation of commercial paper, to the great inconvenience of the public, by admitting such a defence. If fraud and imposition in obtaining a note will not avoid it in the hands of an innocent endorsee—because such a rule would render commercial paper less valuable and convenient as a medium of exchange—why should the drunkenness of the maker? Why should drunkenness be a defence if there has been no fraud or imposition? And if there has, and this is the ground of the defence, why should it not avoid the note in the one case as well as in the other? If then drunkenness is no defence as against the endorsee without notice of the maker's condition, was the bank guilty of gross negligence in taking the note, under the circumstances, without inquiry of the maker? There was nothing suspicious in the appearance of the note, or in the character of the signature—nothing to indicate that it was the note of a drunken man. So far as appears from the evidence, the signature was the usual and ordinary one of the maker. If it had the appearance of being written by a drunken man, the bank might have been put upon inquiry. The fact that the bank was informed that the note was given for a patent hay-fork and purchased it, with other notes, amounting in the aggregate to about $3000, for fifty cents on the dollar, and took from the payees a guaranty that it should realize that amount out of the notes, was no evidence that the bank was guilty of gross negligence in taking the note without inquiry. But if the evidence had made out a case of gross negligence on the part of the bank, that alone would not

19 P. F. SMITH—14

[State Bank *v.* McCoy.]

have been sufficient to defeat its title to the note. As shown by Mr. Justice Read in Phelan *v.* Moss, 17 P. F. Smith 59, there must have been proof that the bank took the note malâ fide or with notice of the fraud. As there was no such evidence the court erred in not affirming the plaintiff's second, third and fifth points.

The question whether it was lawful for the bank to purchase the notes at so great a rate of discount; and if not, whether there can be a recovery on the note in suit, does not arise on this writ of error, and therefore we express no opinion upon it. Where the verdict is for the defendant no question of law can be properly reserved, for no judgment can be entered in favor of the plaintiffs *non obstante veredicto* in case of a decision in his favor: Robinson *v.* Myers, 17 P. F. Smith 9. We must therefore reverse the judgment and remit the record to the court below for a new trial.

Judgment reversed, and a *venire facias de novo* awarded.